# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JONATHAN H. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0907-JTL |
| | ) | |
| ROCKPOINT GROUP, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION DENYING MOTION TO DISMISS COUNT III AND GRANTING CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

Date Submitted: October 11, 2023
Date Decided: January 9, 2024

Christopher B. Chuff, Joanna J. Cline, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware; A. Christopher Young, Erica H. Dressler, TROUTMAN PEPPER HAMILTON SANDERS LLP, Philadelphia, Pennsylvania; *Attorneys for Plaintiff, Jonathan H. Paul.*

Blake Rohrbacher, Matthew D. Perri, Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joseph M. McLaughlin, Anthony C. Piccirillo, SIMPSON THATCHER & BARTLETT LLP, New York, New York; *Attorneys for Defendant, Rockpoint Group, LLC.*

**LASTER, V.C.**

The plaintiff co-founded an investment fund complex. When he departed, his former partners (in the colloquial sense) agreed to pay him a share of the proceeds from certain future transactions. They memorialized their agreement in an amendment to the limited liability company agreement that governed the management entity for the fund complex. An annex to that amendment established a dispute resolution mechanism to determine the value of the plaintiff's share if a qualifying transaction occurred.

A qualifying transaction occurred, but the plaintiff and his former partners could not agree on what the plaintiff would receive. At that point, rather than resorting to the dispute resolution mechanism, the former partners caused the management entity to contest whether the transaction triggered the plaintiff's right in the first place. The plaintiff prevailed on that issue after multi-year proceedings before this court and on appeal.

Now, the management entity disputes what the dispute resolution mechanism contemplates. That procedure calls for the parties to agree on an appraiser to value the plaintiff's share of the transaction proceeds. If the two sides can't agree (and they couldn't), then each side picks an appraiser. After each appraiser prepares a valuation, the appraisers meet and attempt to reach agreement on a valuation. If the appraisers can't agree (and they couldn't), then the two appraisers pick a third appraiser. That appraiser chooses one of the two valuations, which establishes the amount due.

The plaintiff has sought judicial relief after the two appraisers prepared their valuations but before the third appraiser has been selected. He contends that the management entity's valuation improperly advances legal arguments about contract formation and interpretation that would prevent the plaintiff from receiving anything. He also contends that the management entity's valuation improperly relies on an affidavit in which the management entity's general counsel purports to describe the intent of the parties when entering into the amendment that memorialized the terms of his departure. He seeks a ruling striking those portions of the management entity's appraisal are improper.

The management entity moved to dismiss the plaintiff's claim, and the plaintiff cross-moved for summary judgment. This decision denies the management entity's motion and grants the plaintiff's motion.

First, the legal questions that the plaintiff has raised are ripe. Whether the management entity proceeded properly is a concrete issue that the court can and should decide now, not later.

Second, the appraiser is an expert and not an arbitrator. The appraiser's authority is therefore presumptively limited, not plenary.

Third, although the appraiser has authority to interpret some aspects of the agreement (most notably valuation terms), the appraiser does not have authority to determine which version of the management entity's LLC agreement governs the dispute. The appraiser therefore cannot decide the legal issues that the management entity presented in its appraiser's report.

Fourth, the management entity's third amended and restated LLC agreement governs. That agreement incorporates by reference the amendment in which the plaintiff and his partners documented the terms of his separation. The governing agreement does not incorporate or otherwise preserve the management entity's first amended and restated LLC agreement.

Finally, the appraiser cannot consider the extrinsic evidence that the management company has attempted to submit. The appraiser's job is to value the plaintiff's interest using valuation techniques.

The management entity must submit a redacted report to the appraiser that eliminates the legal arguments and extrinsic evidence from the submission. The plaintiff will take the first crack at redacting the offending material. If the parties cannot agree on redactions, then the plaintiff will file a motion asking the court to address that issue.

## I.    FACTUAL BACKGROUND

The facts are drawn from the parties' briefing on the present motions and the record in the case. The facts are not in dispute.[1]

## A.    The Company

Defendant Rockpoint Group, LLC ("Rockpoint" or the "Company") is a member-managed Delaware limited liability company that sits at the center of an investment fund complex. Before the events giving rise to this litigation, the Company's

---

[1] Citations in the form of "Ex. __" refer to the exhibits to the motions. Citations in the form "Dkt. __" refer to docket entries.

principals, whom the parties call the "Managing Members," controlled the Company and owned all of its member interests (the "Member Interests"). Jonathan H. Paul co-founded the Company and was one of the Managing Members.

The Company manages four separate funds that are pertinent to this dispute (the "Funds").[2] The Funds are limited partnerships, so for purposes of entity-law formalities, they are managed by their general partners (the "Fund GPs"). Before the transaction giving rise to this litigation, the Company owned all the equity in each Fund GP (the "Fund GP Interests"). In corporate parlance, each Fund GP was a wholly owned subsidiary of the Company. The Company thus controlled the Fund GPs who controlled the Funds. As a practical matter, the Company managed the Funds.

Before the transaction, the Company received distributions from the Fund GPs that fell into three buckets. "Fee Income" reflected a percentage of each Fund's assets under management.[3] "Promote Income" reflected a share of the Fund's capital gains attributed to the Fund GP's carried interest in the Fund. "Investor Income" reflected the income and capital gains resulting from the Company investing its own capital in

---

[2] Saying there are four Funds simplifies matters. In addition to the main Funds, there are assorted side-car versions of two of the Funds and an offshore version of one of the Funds. *See* Dkt. 92 Ex. 21 Sched. 3.22(a)-1. The analysis for purposes of the main Funds applies equally to their affiliates.

[3] That description is a simplification. Each of the Funds calculates Fee Income using different thresholds and formulas. See Dkt. 92 Ex. 21 Sched. 3.22(a)-1.

the Funds. In some instances, the Managing Members contributed capital to the Company, which invested the capital in the Funds on the Managing Members' behalf.

As noted, the Managing Members owned all of the Member Interests. Those Member Interests, however, were not plain vanilla member interests that bundled all of the economic rights and governance rights associated with an ownership stake into a single class of units. Instead, the Company's LLC agreement created separate economic interests that corresponded to the three income streams that the Company received. There were (i) interests conferring on the Managing Members a right to receive distributions corresponding to the Company's Fee Income (the "Member-Level Fee Interests"), (ii) interests conferring on the Managing Members a right to receive distributions corresponding to the Company's Investor Income (the "Member-Level Investor Interests"), and (iii) interests conferring on the Managing Members a right to receive distributions corresponding to the Company's Promote Income (the "Member-Level Promote Interest").

## B. Paul Resigns.

In April 2007, Paul resigned as a Managing Member. At the time, the Company's internal affairs were governed by the Amended and Restated Limited Liability Company Agreement of Rockpoint Group, LLC (the "First LLC Agreement").[4] To memorialize the terms of Paul's departure, Paul and his colleagues

---

[4] Dkt. 143 Ex. C (cited as FA § __"). The First LLC Agreement was not the Company's first LLC agreement. It was the Company's first *amended and restated* LLC agreement.

amended the First LLC Agreement. It was the ninth amendment they had agreed to, they titled it the "Ninth Amendment."[5]

The Ninth Amendment generally entitled Paul to receive a portion of the proceeds from a "Company Sale." That term encompassed six types of transactions, but only three are relevant: a "Company Partial Asset Sale," a "Company Stock Sale," and a "Company Merger." The Ninth Amendment also specified valuation rules to determine the amount owed to Paul. In an annex, the Ninth Amendment established a dispute resolution mechanism to address valuation disputes.[6]

One obvious issue was the extent to which the remaining Managing Members could vote to modify the First LLC Agreement, including the Ninth Amendment, after Paul left. If they could amend the First LLC Agreement freely, then Paul's bargained-for rights would not have meant much. The Ninth Amendment addressed this issue by stating: "No amendment of the [First LLC] Agreement shall materially affect or modify the rights or obligations of, or economic results to, Paul under the [First LLC] Agreement as modified by this Amendment, without the prior approval of Paul." NA § 8.1.5.

In January 2011, four years after Paul's departure, the Managing Members amended and restated the LLC agreement for a second time (the "Second LLC

---

[5] Dkt. 143 Ex. A (cited as "NA § __").

[6] Dkt. 143 Ex. A, Annex (cited as "Annex at __").

Agreement").[7] In an ancillary schedule, the Second LLC Agreement repeated the provisions of the Ninth Amendment almost verbatim. The Managing Members did not solicit Paul's vote on the Second LLC Agreement, evidencing that they did not think it materially affected his rights.

On December 22, 2014, seven years after Paul's departure, the Managing Members amended and restated the Company's LLC agreement a third time (the "Third LLC Agreement").[8] The Managing Members did not solicit Paul's vote on the Third LLC Agreement, again evidencing that they did not think it materially affected his rights.

Although there was no intent to change Paul's rights, the Third LLC Agreement took a different approach to memorializing his continuing rights. The Second LLC Agreement had reiterated the terms of the Ninth Amendment in an ancillary schedule. The Third LLC Agreement incorporated the Ninth Amendment by reference through Section 13.15, which states that Schedule C contains "special provisions relating to Paul" and specifies that those provisions "shall control over any inconsistent provisions of" the Third LLC Agreement. TA § 13.15. That schedule stated in its entirety: "For Special Provisions relating to Paul, see that certain Ninth Amendment to [the First LLC Agreement]." *Id.* Sched. C. The Third LLC Agreement separately referenced the Ninth Amendment in Section 5.09, which stated that the

---

[7] Dkt. 143 Ex. D.

[8] Dkt. 143 Ex. E (cited as TA § __").

7

Company was required to distribute certain sales proceeds "to Paul, to the extent required by Schedule C." TA § 5.09.

## C. The Transaction

In March 2018, the Company and the Managing Members engaged in the transaction that gives rise to this litigation (the "Transaction"). The counterparty was a fund controlled by Blackstone Group L.P. ("Blackstone"). The Transaction brought $450 million into the Company. That total comprised $325 million in liquidity for the Managing Members plus $125 million in capital that could be committed to future investments.

The economic substance of the Transaction involved selling an interest in the Company to Blackstone in return for $450 million in member-level proceeds for Managing Members and capital for the Company. The Ninth Amendment contemplated that in such a transaction, Paul would receive a share of the proceeds.

To carry out the Transaction, the Managing Members created two new Delaware limited partnerships: Rockpoint Manager Holdings, L.P., and Rockpoint GP Holdings, L.P. (together, the "New Holdings LPs"). The Transaction shifted the Managing Members' right to distributions of Fee Income to Rockpoint Manager Holdings, L.P., so it is helpful to call it "Fee Holdings LP." The Transaction shifted the bulk of the Company's interests in the Fund GPs to Rockpoint GP Holdings, L.P., so it is helpful to call it "GP Holdings LP." The Managing Members also formed a new Delaware limited liability company, RPG GP, L.L.C. ("New GP"), to act as the general partner for the New Holdings LPs.

8

The Transaction proceeded via a series of steps, all of which were carried out virtually simultaneously during a closing effective March 13, 2018. In simplified terms,[9] the first step involved the Company transferring some of its interests in the Fund GPs to GP Holdings LP in exchange for limited partner interests in GP Holdings LP. The second step involved the Company distributing those limited partner interests in GP Holdings LP to the Managing Members (but characterizing the distribution as a redemption of Member-Level Investor Interests and Member-Level Promote Interests). The third step involved the Managing Members exchanging their Member-Level Fee Interests for limited partner interests in Fee Holdings LP. The fourth step involved Blackstone paying an aggregate of $450 million for limited partner interests in the New Holdings LPs.

The Company gave notice of the Transaction to Paul as if it were a Company Sale and acknowledged that he would receive some share of the value from the Transaction. But when the two sides could not agree on an amount, the Company insisted the Transaction was not a Company Sale and that Paul was not entitled to anything.

**D.    The Dispute Over Whether The Transaction Was A Company Sale.**

On December 14, 2018, Paul filed this case. His amended complaint contained three counts. Count I sought a declaratory judgment that the Transaction constituted a Company Sale and thus triggered Paul's rights to a share of the proceeds under the

---

[9] The court has previously discussed the transaction in greater detail. *See Paul v. Rockpoint Gp., LLC*, 2021 WL 3208005 (Del. Ch. July 28, 2021).

9

Ninth Amendment. Count II sought a declaratory judgment that the Company was obligated to "allocate the net sales proceeds of the [Transaction] only to the Funds and Other Businesses, and not to Hypothetical Future Funds." Dkt. 24 ¶ 105. Count III asserted a breach of contract claim against the Company for failure to properly allocate proceeds under the Ninth Amendment.

The Company moved to dismiss the amended complaint under Rule 12(b)(6). Throughout the briefing and argument, the Company acted as if the First LLC Agreement was the governing agreement. No one mentioned the Second LLC Agreement or the Third LLC Agreement.[10] Because they were executed years after he left, Paul had no reason to know about them. The Company obviously knew about them, but did not see fit to mention them.

The court denied the motion to dismiss Count I, holding that while it was not reasonably conceivable that the Transaction qualified as a Company Stock Sale or a Company Merger, it was reasonably conceivable that the Transaction qualified as a Company Partial Asset Sale. Dkt. 44 (the "Pleading-Stage Order"). The court ordered supplemental briefing on whether subject matter jurisdiction existed for Counts II and III.

After supplemental briefing, the court dismissed Count II and III for lack of subject matter jurisdiction. Dkt. 50 (the "Subject Matter Jurisdiction Order"). The court noted that the Ninth Amendment appointed a "Settlement Appraiser" to

---

[10] *See* Dkt. 31 at 1 n.1; Def's Reply Br. Dkt. 39 at 1 n.1.

address valuation disputes as part of dispute resolution mechanism (the "Appraisal Process"). Based on the court's understanding of the issues then in dispute, the court reasoned that the Settlement Appraiser had "authority to resolve the parties' dispute over the proposed allocation" as part of the Appraisal Process. *Id.* ¶ 8.

In reaching this conclusion, the court found it unnecessary to rule on whether the Settlement Appraiser was empowered to act as an expert or an arbitrator. The parties linked that question to whether the Settlement Appraiser could interpret terms in the Ninth Amendment, but the court held that the label was not dispositive.

> Under the Amendment, the appraiser has the ultimate authority to resolve any disputes related to the allocation raised in the Notice of Disagreement. One such dispute is whether the Company's proposed allocation of proceeds to future funds comported with the valuation rules in the Amendment. Resolving that dispute requires the appraiser to determine the meaning of "franchise value, premium to net asset value or other goodwill." The Amendment thus contemplates that the appraiser has the authority to interpret the terms of the contract to the extent that doing so is necessary to resolve disputes raised in the Notice of Disagreement. To hold otherwise would usurp improperly the appraiser's authority over those disputes.

*Id.* ¶ 10 (citations omitted). The court thus held that the Settlement Appraiser had authority to interpret and apply valuation-related terms, such as the terms Paul had identified as requiring interpretation.

After the court's rulings, the Company disclosed the existence of the Second LLC Agreement and the Third LLC Agreement. On December 30, 2020, Paul filed a second amended complaint that continued to rely on the First LLC Agreement. Dkt. 76. That pleading added a new Count II, which asserted a claim for breach of contract based on the Company's refusal to pay Paul "for his portion of the Company Sale proceeds" as required by the Ninth Amendment. *Id.* ¶ 103.

11

The Company answered, and the parties filed cross-motions for summary judgment. With the cross-motions, the parties submitted additional materials and provided a more detailed explanation of the Transaction.

The court issued three orders. The first order vacated the Pleading-Stage Order to the extent it held "that it was not reasonably conceivable that the Transaction could constitute a Company Stock Sale." Dkt. 103 ¶ 26. The court explained that it had not properly understood the details of the Transaction when issuing the Pleading-Stage Order such that the interests of justice required revisiting that ruling.

The second order dismissed Count II as unripe. Dkt. 108. The court reasoned that if it found that the Transaction qualified as a Company Sale, then the Settlement Appraiser still would need to determine that the Company owed Paul a share of the proceeds, and that determination had not yet been made. Even then, a breach of contract would not exist until the Company failed to pay the amount due. Until those steps had occurred, the court did not need to act.

The third order granted summary judgment in Paul's favor and held that the Transaction qualified as a Company Partial Asset Sale. Dkt. 111. The court ordered the parties to engage in the Appraisal Process to the extent they continued to have valuation disputes.

Rockpoint appealed, and the Supreme Court of Delaware affirmed. *Rockpoint Gp., L.L.C. v. Paul*, 284 A.3d 380 (Del. 2022) (TABLE). At that point, the parties

12

began to follow the Appraisal Process. The court stayed this action pending the outcome. Dkt. 137.

In staying the case, the court noted that it had not formally determined "whether the dispute resolution mechanism in the LLC agreement contemplates an expert determination or a plenary appraisal." *Id.* at 3. The court observed that "[i]f it becomes necessary to address that issue, or if other disputes arise involving the scope of the dispute resolution mechanism, then this court is the proper forum for resolving them." *Id.* The court also observed that any request for a ruling should not be hypothetical, but rather "brought in the context of a concrete dispute." *Id.*

E.    The Appraisal Process

The Appraisal Process has multiple stages. First, the parties must meet and confer in an effort to reach agreement on a share of the proceeds. They conferred, but could not agree.

Next, the parties had to confer on the selection of a single Settlement Appraiser to determine the value of Paul's share. They conferred, but could not agree.

Without any agreement, each side had to select an appraiser that would value Paul's share. The Company chose Colchester Partners, LLC. Paul chose FTI Consulting, Inc.

The Appraisal Process called for the appraisers to exchange appraisals, then confer in an effort to reach agreement on a value for Paul's share. Paul's appraiser prepared an appraisal focused on valuation. The Company's appraiser prepared an appraisal that conducted legal analysis to conclude that Paul was not entitled to any share of the Transaction proceeds. In reaching that conclusion, the Company's

13

appraiser relied on (i) a memorandum in which Professor Lawrence A. Hamermesh, a Delaware attorney, opined on the meaning of the First LLC Agreement (the "Legal Opinion"), and (ii) a declaration from the Company's General Counsel, Patrick K. Fox, the principal drafter of the Ninth Amendment, in which he purported to describe what the Ninth Amendment was intended to do (the "Fox Declaration"). The Company's appraisal also attached an exhibit titled "Questions Regarding The BSCH Investment In Rockpoint," which started with a series of basic points about the Company, then quickly transitioned into lawyers' argument about how the appraiser should interpret the relevant provisions and allocate value (the "FAQs").

Based on these materials, the Company's appraisal concluded that the operative agreements is the First LLC Agreement as amended by the Ninth Amendment, not the Third LLC Agreement. The Company expressly asserts that the First LLC Agreement is "the key operating agreement that governs the rights and obligations of the current and former members…." FAQs at 2. Paul, by contrast, maintains that the governing agreement is the Third LLC Agreement.

Relying on the same materials, the Company's appraiser concluded that Section 5.09 of the First LLC Agreement limited sales proceeds attributable to future businesses. Paul, by contrast, maintains that because the Third LLC Agreement is the governing agreement, Section 5.09 of the First LLC Agreement is irrelevant.

In its FAQs, the Company boldly asserted that the appraisal turned on a legal question. The FAQs posed the following hypothetical question, "So is this all about whether fee income and promote income projected to come from Rockpoint funds

14

expected to be formed after 2018 constitute 'franchise value,' premium to net asset value,' and/or "goodwill'?" FAQs at 12. In response, the FAQs state:

> No. Absolutely not. The proposition that whether or not value attributable to funds projected to be raised after the BSCH Transaction constitutes goodwill, premium to net asset value, and/or franchise value is determinative here is beside the point and is a red herring.
>
> The real question is, "Does the specific prohibition of Section 6.5.3 of the Amendment (taking into account the nature and purpose of the larger Section 6.5 in which it sits), in the context of the overall provisions and purposes of the economic arrangements set forth in the Amendment and the Agreement, serve as a clear amendment to the Agreement and the other provisions of the Amendment so as to affirmatively require that Paul be paid, for his portion of the Promote Percentages for the existing funds in which he had an interest, the full value of the primary and secondary proceeds allocable to successor funds to the funds then in existence, even though transferring that value to Paul would be totally contrary to (x) the provisions of the Amendment which provide him with a limited tail right that ends as of January 1, 2018 and (y) the economic realities of both the actual valuations used and what BSCH acquired in the BSCH Transaction?"

*Id.* The Company thus reframed the valuation issue as a question of contract interpretation.

When the appraisers conferred in an effort to reach a consensus on valuation, they could not agree. The Company's appraiser relied in part on legal arguments that Paul's appraiser had not addressed, so the appraisers lacked a common foundation on which they could build a consensus valuation.

The appraisers therefore had to choose a third independent appraiser to serve as the Settlement Appraiser. To date, the appraisers have agreed in principle on a firm, but have not formally retained them. The Appraisal Process states that once appointed, the Settlement Appraiser "shall select from the determinations of the two

15

[appraisers] the determination that it believes to be most correct, which shall then become final, conclusive and binding on the parties hereto." Annex at 2.

## F.     The Litigation Resumes.

In March 2023, Paul filed a supplemental complaint. Dkt. 143. In a new Count III, Paul asks the court to make a series of declarations:

- The appraisal is an expert determination, and the Settlement Appraiser has limited authority.

- The Settlement Appraiser's authority does not include determining which version of the LLC Agreement is the operative agreement. The Company must therefore remove references to Section 5.09 of the First LLC Agreement from its appraisal.

- The Settlement Appraiser cannot consider extrinsic evidence. The Company must therefore remove references to the Fox Declaration from its appraisal.

- The Third LLC Agreement is the operative LLC Agreement, which supersedes all prior agreements and understandings and renders them a legal nullity.

*Id.* ¶ 143. The Company moved to dismiss Count III as failing to state a claim on which relief can be granted. Paul cross-moved for summary judgment.

## II.     LEGAL ANALYSIS

The parties disagree over how much of the proceeds Paul will receive from the Transaction. That is a valuation issue for the Settlement Appraiser to decide. The current dispute exists because the Company's lawyers have attempted to turn a dispute resolution mechanism designed to resolve disagreements over valuation into a forum for legal arguments. That effort runs contrary to the Appraisal Process.

## A.     The Standards For Deciding The Motions

The Company has moved to dismiss Count III under Rule 12(b)(6). When considering a Rule 12(b)(6) motion, the court views the complaint in the light most

16

favorable to the non-moving party, accepts the well-pled allegations, and draws reasonable inferences from those allegations. *Gantler v. Stephens*, 965 A.2d 695, 703–04 (Del. 2009).

Paul has cross-moved summary judgment on Count III under Rule 56. When considering a Rule 56 motion, a court examines the record with all factual issues resolved in favor of the non-moving party and determines whether, on that record, the movant is entitled to judgment as a matter of law. Ct. Ch. R. 56(c).

The different procedural standards could produce different factual records, with the record viewed in Paul's favor for the Company's motion and in the Company's favor for Paul's motion. In this case, the different standards do not matter, because the parties agree on the operative facts. They only disagree about their legal consequences. For questions of law, the analytical framework is the same.

## B. Ripeness

The Company first disputes whether Paul's declaratory judgment claims are ripe. By statute, Delaware courts have jurisdiction to issue declaratory judgments. 10 *Del. C.* §§ 6501–6513. But Delaware courts only exercise that jurisdiction when a dispute is sufficiently concrete and mature to address. *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216–17 (Del. 2014). "The grant of declaratory judgment is always discretionary; and before a court should declare the rights of parties in a dispute, it must not only be convinced that litigation sooner or later appears to be unavoidable, but also that the material facts are static and that the rights of the parties are presently defined rather than future or contingent." *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 481 (Del. 1989) (cleaned up). "Conversely, a

17

dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention." *XL Specialty*, 93 A.3d at 1217–18 (cleaned up). "The underlying purpose of that principle is to conserve limited judicial resources and to avoid rendering a legally binding decision that could result in premature and possibly unsound lawmaking." *Id.* at 1217.

The dispute here concerns whether the Company's appraisal improperly includes legal assertions and extrinsic evidence. The facts regarding the contents of the Company Appraisal are static; they are not uncertain and do not depend on future events. In that sense, the dispute is ripe.

The Company argues that the dispute is not ripe because the Settlement Appraiser might pick Paul's Appraisal, or the Settlement Appraiser might choose the Company's appraisal without relying on any of the aspects that Paul claims are improper. The Company says that either decision would obviate the need for judicial intervention, meaning the court should wait and see.

Contrary to the Company's arguments, the dispute warrants deciding now. Determining whether the contents of the Company Appraisal are proper before that information reaches the Settlement Appraiser is preferable to attempting to determine after the fact whether the Settlement Appraiser was swayed by improper information.

Consider an analogy to the rules of evidence. When a party presents evidence to a jury, the opponent can object. The presenting party must explain why the

18

evidence is admissible. It is no answer to argue that the evidence should come in and everyone should wait and see what the jury decides. If it turns out, in hindsight, that evidence was admitted improperly, then it becomes necessary to determine whether the error was harmless. But whenever possible, decisions on what a jury hears are made up front.

Or consider how Delaware courts approach alleged disclosure violations in connection with a stockholder vote. When a plaintiff establishes a reasonable likelihood of a material misstatement or omission, the defendants cannot respond that the court should simply let the vote go forward to see how it comes out. The material misstatement or omission inflicts injury on the decision-making process itself, which constitutes irreparable harm. Sometimes it may be necessary to adjudicate disclosure claims after the fact. Sometimes the materiality of the information may not be sufficiently clear to warrant injunctive relief. Or sometimes the balancing of the hardships may warrant denying the application. But for material misstatements or omissions, an after-the-fact adjudication is a second-best solution. Whenever possible, a material misstatement or omission should be addressed before the stockholders decide, not after.

The same is true here, and to a far greater extent, because the parties disagree about the fundamental issue of which LLC agreement governs. Allowing the Settlement Appraiser to consider the legal effect of an agreement that has been superseded under Delaware law would risk tainting the outcome.

The better approach is for the court to rule now on what information the Settlement Appraiser can consider. *See i3 Plastic Cards, LLC v. MPS Dallas Cards, LLC*, 2019 WL 2027662, at *3 (Del. Ch. May 8, 2019) (ORDER). The Settlement Appraiser might have picked Paul's appraisal in any event, but Paul need not take that risk. He can object now to what the Company is trying to do.

## C.  The Appraisal Process Calls For An Expert Determination.

On the merits, the parties first disagree about whether the Appraisal Process contemplates an expert determination or a plenary arbitration. To date, the court has refrained from ruling on that issue, holding only that regardless of the proper characterization, the Settlement Appraiser has authority to interpret and apply valuation-related terms like premium to net asset value, goodwill, and franchise value. Now, however, the Company's tactics during the Appraisal Process require an answer: The Settlement Appraiser is an expert, not a plenary arbitrator. The Settlement Appraiser therefore has authority to interpret contract terms to the extent necessary to fulfill its valuation task, but lacks authority to address broader questions of contract formation and interpretation, such as which version of the LLC Agreement governs the Appraisal Process or whether Paul possesses any appraisable interests under the operative agreement.

Binding alternative dispute mechanisms fall along a spectrum:

At one end is an arbitration that has the look and feel of a judicial proceeding, except that it is handled privately and with less formality. At the other end is an expert determination in which an expert with technical skills or knowledge makes a determination, largely on its own, and with only limited party input.

20

*ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 989 (Del. Ch. 2023). In a plenary arbitration, the arbitrator has authority "to decide all legal and factual issues necessary to resolve the matter." *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 618 (Del. 2023) (cleaned up). By contrast, an expert determination is typically limited "to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation." *Id.* (cleaned up). Parties can tailor either type of dispute resolution mechanism to look more like the other, generating a range of possibilities. *ArchKey*, 302 A.3d at 990.

To properly characterize a dispute resolution mechanism, a court applies the authority test. That test compares the parties' chosen mechanism with the avatars of a legal arbitration or expert determination. *Id.* at 993–94. Using the word "arbitrator" or "arbitration" provides a strong signal that a legal arbitration is intended, just as using the phrase "as an expert and not as an arbitrator" strongly signals an expert determination. But labels are not dispositive. If the parties have used one term but constructed a mechanism that operates like the other, then a court will give effect to the parties' actual agreement. *See id.* at 992.

Here, the Annex never refers to the Settlement Appraiser as an arbitrator; the Annex consistently refers to "appraisers" and "appraisal." That is important, because "[o]riginally experts often determined the value of an asset, and much of the early law refers to the expert determination process as a 'valuation' or 'appraisement.'" *Id.* (citing Clive Freedman & James Farrell, *Kendall on Expert Determination* 4–5 (5th ed. 2015) [hereinafter *Kendall on Experts*]). Using the terminology of "appraisers" and

21

"appraisal" provides a powerful indication that the Appraisal Process calls for an expert determination.

The steps in the Appraisal Process are comparable to an accountant true-up mechanism, which is "too far away from legal arbitration to be governed by the [Federal Arbitration Act]" or otherwise qualify as an arbitration. *Id.* at 995. "Without additional signals, an Accountant True-Up Mechanism is a beefed-up expert determination, not a slimmed down legal arbitration." *Id.*

The only signal that favors arbitration is the final step of the Appraisal Process, which resembles baseball arbitration in that the Settlement Appraiser choses between the parties' appraisals. *Id.* at 990. But picking between two submissions is not unique to arbitration; it is also a common feature of expert determinations. *Id.*

Last, the Annex specifies that the Settlement Appraiser's valuation determination "shall be final, conclusive and binding on the parties[.]" That is standard language for an expert determination.[11]

---

[11] *See Archkey*, 302 A.3d at 991(holding accounting true-up mechanism is a form of expert determination and including in list of "standardized steps" for an accountant true-up mechanism that "[t]he accountant's determination is final and binding.") (citing A. Vincent Biemans & Gerald M. Hansen, *M&A Disputes: A Professional Guide to Accounting Arbitrations* 19–20 (2017)); *see also Kendall on Experts, supra*, at 164 ("Expert determination leads to a result which is binding on parties to a contract which so provides. If a procedure set out in a contract does not necessarily lead to a binding result, the system is not an expert determination."); *id.* at 165 ("Expert determination clauses very commonly provide that the decision will be 'final and binding[,]' and it is clearly in the parties' interests that they should be so."); Comm. on Int'l Com. Disputes, N.Y.C. Bar Ass'n, *Purchase Price Adjustment*

The Appraisal Process accordingly calls for an expert determination. It does not contemplate plenary arbitration.

**D.      The Scope Of The Settlement Appraiser's Authority To Interpret Contract Language**

The parties next dispute on the merits concerns whether the Settlement Appraiser has the authority to interpret contract language and make legal rulings. All questions of contractual interpretation and legal rulings are not the same. Here, the Company wants the Settlement Appraiser to determine that the First LLC Agreement, not the Third LLC Agreement, governs Paul's rights. The Settlement Appraiser does not have the authority to make that determination.

"In the case of a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation." *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 464 (Del. Ch. 2018) (cleaned up). "The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability." *Id.* (cleaned up).

---

*Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements*  67 (2013) (form standard of review clause stating "The determination by the Independent Accountants shall be final and binding on the parties.") (emphasis removed)).

That does not mean, however, that an expert has no ability to interpret contractual terms. "A court need not construe every word in a provision calling for an expert determination before the expert can do its work." *ArchKey*, 302 A.3d at 997.

> It may be necessary for the expert, in order to decide the point which has been referred to him, to decide a disputed point of interpretation of the contract between the parties. Unless it is clear that the expert has no jurisdiction to decide a disputed point of interpretation, the expert will normally reach his own decision on the point, leaving the parties to refer the matter to the court at a later date should they wish to do so.

*Id.* at 997–98 (quoting *Kendall on Experts*, *supra*, at 229). "The more closely related the term or provision is to the expert's area of expertise, the more likely it is that an expert can interpret the term without judicial assistance." *Id.* at 997.

In the Subject Matter Jurisdiction Order, the court recognized that the Settlement Appraiser has authority to interpret contractual terms relating to valuation and the allocation of proceeds, noting:

> [T]he appraiser has the ultimate authority to resolve any disputes related to the allocation raised in the Notice of Disagreement. One such dispute is whether the Company's proposed allocation of proceeds to future funds comported with the valuation rules in the [Ninth] Amendment. Resolving that dispute requires the appraiser to determine the meaning of "franchise value, premium to net asset value or other goodwill." The [Ninth] Amendment thus contemplates that the appraiser has the authority to interpret the terms of the contract to the extent that doing so is necessary to resolve disputes raised in the Notice of Disagreement.

Dkt. 50 ¶ 10 (citations omitted).

24

The Company now wants the Settlement Appraiser to make a far more momentous determination by ruling on which version of the LLC Agreement governs the parties' dispute. That issue falls outside the Settlement Appraiser's authority. Under the Ninth Amendment, the appraisers were to determine "the proportionate allocation" of proceeds from the Company Sale. Annex at 2. Because the parties' appraisers could not agree, the Settlement Appraiser must determine "whether and to what extent (if any) the proportionate allocation used in the higher of the two [party] appraisals shall be used." *Id.* The Settlement Appraiser must "select from the determinations of the two [party appraisals] the determination that it believes to be most correct, which shall then become final, conclusive and binding on the parties hereto." *Id.*

That grant of authority does not encompass major legal issues. It did not empower the Settlement Appraiser to decide whether the Transaction qualified as a Company Sale. It likewise does not empower the Settlement Appraiser to determine which iteration of the LLC Agreement governs Paul's rights. The court must decide that issue.

Because the court, and not the Settlement Appraiser, must decide which version of the LLC Agreement applies, the Company's appraisal should not have addressed that topic. The Company must redact any discussion of that issue from its appraisal before submitting the appraisal to the Settlement Appraiser.

E.    The Governing Agreement

At this point in the analysis, the logical next step is for the court to determine version of the LLC agreement governs Paul's rights. The Company argues that the

Appraisal Process arises from First LLC Agreement and the Ninth Amendment, not the Third LLC Agreement. Paul argues that the governing agreement is the Third LLC Agreement. As a matter of contract law and LLC law, the Third LLC Agreement plainly applies. That agreement incorporates the Ninth Amendment by reference. The First LLC Agreement is not part of the analysis.

"A binding and completely integrated agreement discharges prior agreements to the extent that they are within its scope." *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 822–23 (Del. Ch. 2020) (cleaned up). "Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded." *Id.* (quoting Restatement (Second) of Contracts § 213 (Am. L. Inst. 1981)). "When a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement 'need[s] to be memorialized in [the subsequent agreement]' to survive." *Id.* at 823 (quoting *Hunt v. Limestone Med. Prop.*, 2018 WL 2939441, at *4 (Del.Ch. June 11, 2018)).

The same is true under the Delaware Limited Liability Company Act. When an LLC agreement provides for the manner of its amendment, then the agreement can only be amended in that manner or as otherwise permitted by law. 6 *Del. C.* § 18-302(e). After a legally compliant amendment, the amended provisions no longer govern. The amended agreement governs. A restated LLC agreement is an agreement that merely integrates and restates the prior LLC agreement and all of its amendments, but does not further amend the LLC agreement. *Cf.* 6 *Del. C.* § 18-

208(a) (explaining what restating a certificate of formation accomplishes). An amended and restated agreement both restates the LLC agreement and makes further amendments. *Cf. id.* (distinguishing between a restated certificate of formation and a restatement that also makes amendments). When parties amend and restate an LLC agreement, they establish a single, integrated, and controlling document.

The chain of pertinent agreements is straightforward. It starts with the First LLC Agreement, which everyone agrees governed the Company's internal affairs (as amended) when Paul and his colleagues negotiated the terms of his departure. They negotiated the Ninth Amendment to govern the terms of Paul's departure. At that point, the First LLC Agreement, as amended by the various amendments including the Ninth Amendment, governed the internal affairs of the Company, including Paul's rights.

As disused in the Factual Background, an obvious issue for the parties to address was the extent to which the remaining Managing Members could vote to modify the First LLC Agreement, including the Ninth Amendment, after Paul left. If they could change its terms freely, then they could deprive Paul of his rights.

The Ninth Amendment addressed this issue in several ways. First, it specified that Paul would be "a Voting Managing Member with respect to each Existing Fund on and subject to the terms and conditions of the Agreement" and "a Non-Managing Member with respect to Fund III, Fund IV and any Future Fund and any Other

Business which has an Initial Closing after the Effective Date [of the Ninth Amendment] and prior to January 1, 2018." *Id.* § 7.1.

Second, in a series of complex provisions, it granted Paul the voting rights generally afforded a Voting Managing Member. Then, the amendment took them away for a series of specific issues plus major issues requiring unanimous votes. But then, the amendment gave the voting rights back again by providing that particular actions could not be taken that would "have a negative impact on the rights or obligations of, or economic results to, Paul under the Agreement, without Paul's prior written consent." *Id.* § 7.4.3.

Third, the Ninth Amendment stated: "No amendment of the [First LLC] Agreement shall materially affect or modify the rights or obligations of, or economic results to, Paul under the [First LLC] Agreement as modified by this Amendment, without the prior approval of Paul." *Id.* § 8.1.5.

Fourth, the Ninth Amendment states that it "may not be modified or amended except by a writing signed by Paul and [the] Required Managing Members." *Id.* § 11.10.

The bottom line was that the Managing Members could amend the First LLC Agreement, but they could not do so in a manner that negatively impacted Paul's

28

rights or economic results without his approval. The parties were so focused on documenting that point that they addressed it through four overlapping provisions.[12]

Four years later, the Managing Members entered into the Second LLC Agreement, which preserved Paul's rights by repeating the contents of the Ninth Amendment almost verbatim as part of the Second LLC Agreement. That was an amended and restated agreement, and it wiped out the prior agreements, replacing them with a single, integrated document. From that point on, Paul's rights were governed by the Second LLC Agreement. The other Managing Members could adopt the Second LLC Agreement without obtaining Paul's consent because the Second LLC Agreement did not materially affect or modify Paul's rights.

Three years after that, the parties entered into the Third LLC Agreement, which is the currently operative agreement. That was an amended and restated agreement, and it wiped out the prior agreements, replacing them with a single, integrated document. To that effect, the Third LLC Agreement contains an

---

[12] The overlapping nature of the provisions does not render them surplusage. "[T]he canon against surplusage merely favors that interpretation which avoids surplusage[.]" *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012). A court should not use the canon to "substitut[e] one instance of superfluous language for another." *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013); *see Lennox Indus., Inc. v. All. Compressors LLC*, 2021 WL 4958254, at *5 (Del. Super. Ct. Oct. 25, 2021) ("Notwithstanding surplusage concerns, redundant interpretations 'are preferable' if construing undefined terms otherwise would contravene the parties' intent."), *aff'd*, 282 A.3d 1053 (Del. 2022). Including multiple protections does not render each one redundant. I feel safer driving a car that has airbags *and* seatbelts, plus other protections like crumple zones and anti-lock brakes.

integration clause, which provides that it "supersedes all prior and contemporaneous agreements … of the parties in connection therewith." TA § 13.09.

The Third LLC Agreement is therefore the operative agreement. Under Delaware law, an LLC Agreement "[m]ay consist of 1 or more agreements, instruments or other writings and may include or incorporate 1 or more schedules, supplements or other writings containing provisions as to the conduct of the business and affairs of the limited liability company or any series thereof." 6 *Del. C.* § 18-101. The Third LLC Agreement exercised that authority by referring to the Ninth Amendment and incorporating its terms. The Third LLC Agreement just as easily could have replicated the Ninth Amendment's terms in a new document, called it "Schedule C," and referenced that. Instead, the Third LLC Agreement referenced Schedule C, which referenced the Ninth Amendment. That had the effect of incorporating the Ninth Amendment—and only the Ninth Amendment—into the Third LLC Agreement.

Because the Third LLC Agreement referenced Schedule C, which referenced the Ninth Amendment, the Third LLC Agreement did not materially affect or modify Paul's rights. The other Managing Members therefore could adopt the Third LLC Agreement without obtaining Paul's consent.

The Third LLC Agreement is the governing agreement.

## F.    The Plain Meaning Of The Governing Agreement

Holding that the Third LLC Agreement is the operative agreement does not resolve the parties' contractual dispute. The court therefore will provide further guidance.

How the Third LLC Agreement applies to this case raises an issue of contract interpretation. The Third LLC Agreement is governed by Delaware law. Under Delaware law, "[w]hen interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). The "contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal citation omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which

31

arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374. Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *Id.* (alterations in original). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting Restatement (Second) of Contracts § 202 (Am. L. Inst. 1981)). "[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning

32

of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (footnote omitted).

Section 13.15 of the Third LLC Agreement states that Schedule C contains "special provisions relating to Paul" and specifies that those provisions "shall control over any inconsistent provisions of" the Third LLC Agreement. *Id.* § 13.15. That schedule stated in its entirety: "For Special Provisions relating to Paul, see that certain Ninth Amendment to [the First LLC Agreement]." TA, Sched. C.

In addition, Section 5.09 of the Third LLC Agreement specifically references the Ninth Amendment for purposes of any sale of "future businesses and good will." That provision states in relevant part:

> If the Company sells an interest in its future businesses and good will to a third party . . . the sales proceeds allocable to good will and future businesses shall be treated as Promote Income but notwithstanding Section 5.03, such Promote Income shall be distributed as follows:
>
> (i) to Paul, to the extent required by Schedule C, and to the Members with Continuing Interests who have not elected to opt out of the sale . . .
>
> (ii) the balance, if any, to the then Voting Managing Members and the Nonvoting Managing Members that are not Defaulting Managing Members.....

TA § 5.09 (formatting added) (the "Third Allocation Provision"). Under the Third Allocation Provision, "sale proceeds allocable to good will and future business" must be treated as Promote Income. Then, to determine whether the Promote Income is distributed to Paul, the provision refers to "Schedule C," which is the Ninth Amendment.

The Ninth Amendment contains a comprehensive, self-contained set of provisions for determining how to allocate proceeds from a Company Sale. Section 6.1 states:

> In the event a Company Sale is consummated while Paul continues to have an interest in any Fund or Other Business, Paul will be entitled to share in the proceeds of such Company Sale as provided in this Article 6. The amount determined to be payable or distributable to Paul pursuant to this Article 6 shall be his sole consideration or distribution in respect of his Interests arising from a Company Sale.

NA § 6.1. In other words, Paul only gets what the Ninth Amendment says he gets. For purposes of determining what Paul receives, the Ninth Amendment displaced the First LLC Agreement entirely and created a stand-alone regime.

Section 6.3 of the Ninth Amendment then states that "Paul's share of the proceeds realized in a Company Sale shall be based on the portion of such proceeds that are allocable to the interests then owned by Paul." *Id.* § 6.3. The Settlement Appraiser must determine "the interests then owned by Paul" and allocate value to him based on those interests.

When determining the total value available for potential allocation to Paul, Section 6.3 requires using "the valuation rules set forth in Section 6.5 of this Amendment and [the Appraisal Process]." *Id.* Section 6.5 contains a series of valuation rules. The Settlement Appraiser must use them to determine the total value available for potential allocation to Paul. Then it must allocate a portion of that value to Paul "based on the portion of such proceeds that are allocable to the interests then owned by Paul." *Id.* § 6.3.

34

Section 6.5.3 identifies one of the valuation rules that the Settlement Appraiser must apply. It states that when determining the total value of Company Sale proceeds potentially allocable to the interests then owned by Paul, "the allocation of proceeds shall be determined without regard to franchise value, premium to net asset value or other goodwill, as such items shall be deemed allocated in accordance with the distribution of where the proceeds are to be distributable without regard to such items." *Id.* § 6.5.3. The plain language of this provision requires that the Settlement Appraiser look at the Transaction and determine whether any portion of the aggregate Transaction proceeds was allocated to franchise value, premium to net asset value, or goodwill. If so, then the Settlement Appraiser must include that value in the total value of Company Sale proceeds potentially allocable to the interests then owned by Paul.

When applying Section 6.5.3, the Settlement Appraiser does not only look at how the parties to the Transaction allocated the proceeds. The Settlement Appraiser also must consider whether any amounts should be "deemed allocated in accordance with the distribution of where the proceeds are determined to be distributable without regard to such items[.]" *Id.* § 6.5.3. The Settlement Appraiser thus has to determine whether any amount of proceeds *should have been* allocated to franchise value, premium to net asset value, or goodwill, even though the parties did not make that allocation. If the Settlement Appraiser determines that a portion of the proceeds was allocated to a different component of transaction value, but should have been treated as allocated to franchise value, premium to net asset value, or goodwill, then

35

the Settlement Appraiser must (i) reallocate that share of value to the proper component, then (ii) incorporate that amount when determining the total value of Company Sale proceeds potentially allocable to the interests then owned by Paul.

For purposes of the Transaction, the total deal consideration consisted of $450 million. Of that amount, $325 million was distributed to the Managing Members. All of that amount can be considered by the Settlement Appraiser when determining the total value of Company Sale proceeds potentially allocable to the interests then owned by Paul.

The more difficult issue is the $125 million that went into the Company and could be committed to future investments. The Settlement Appraiser must determine whether any of that amount should have been allocated to franchise value, premium to net asset value, or goodwill. If the answer is yes, then the Settlement Appraiser must include the amount that should have been allocated to franchise value, premium to net asset value, or goodwill in the total amount of proceeds that can potentially be allocated to Paul.

For example, the Settlement Appraiser might determine that $5 million of the $125 million that was nominally designated as capital to be used in future funds or deals actually reflects a payment for the goodwill of the business. Maybe that goodwill existed because of the value of the Rockpoint brand, or maybe because of the relationships Rockpoint has built with investors who regularly invest in its funds, or maybe because of a stellar cadre of employees that have been with the Company since its founding, or perhaps for some other reason determined by the Settlement

Appraiser. If the Settlement Appraiser reaches that conclusion, then then the total value available for potential reallocation to Paul becomes $330 million, rather than $325 million.

That is what the plain language of the Ninth Amendment requires. A court can depart from the plain language of a contract when a plain reading would create an irrational result, but that is not an irrational result. As a co-founder who helped build the Company during its early years, Paul could have contributed to components of potential value that could fall under the heading of goodwill. It is not irrational that he would receive a share of Company Sale proceeds attributable goodwill. The same is true for franchise value and premium to net asset value.

The Ninth Amendment does not define franchise value, premium to net asset value, or goodwill, but those are valuation terms. The Settlement Appraiser must use its knowledge and experience as a valuation expert to interpret and apply those terms to the Transaction. The Court will not substitute its views of those terms for the judgment of the Settlement Appraiser.

To defeat this plain language interpretation, the Company relies on Section 5.09 of the First LLC Agreement. The Company argues that the Ninth Amendment amended the First LLC Agreement, so those two agreements must be considered together. Not so for Article 6 of the Ninth Amendment. Section 6.1 of Article 6 makes clear that it is a free-standing valuation provision that addresses the allocation of proceeds from a Company Sale. There is no longer any reason to look at Section 5.09 of the First LLC Agreement. The Ninth Amendment rendered it irrelevant for

purposes of analyzing the proceeds of a Company Sale, and the Second LLC Agreement and the Third LLC Agreement displaced it in its entirely, with the Third LLC Agreement incorporating only the Ninth Amendment by reference.

The Company wants to rely on Section 5.09 of the First LLC Agreement because the Company believes that section governs the allocation of value for future business. Section 5.09 of the First LLC Agreement consists of two lengthy sentences. The first addresses transactions associated with the Company's current business and states:

> If the Company shall sell all or part of its interests in any Fund GP or Other Business GP or incur loans, or cause any Fund GP or Other Business GP to sell all or part of its interests in any Fund or Other Business or to incur loans, the sale or financing proceeds shall be deemed to constitute Fee Income, Promote Income or Investor Income of the applicable Fund or Other Business to the extent such proceeds are reasonably allocable to such categories of income, with the method of such allocation to be determined by the Required Managing Members.

FA § 5.09. The second sentence addresses transactions associated with the Company's future business and states:

> If the Company sells an interest in its future business to a third party (including, without limitation, by admitting such purchaser as a new Member) the sales proceeds thereof shall be treated as Promote Income but notwithstanding Section 5.03 such Promote Income shall be distributed only to the Managing Members in proportion to their weighted average Promote Interests for each existing Fund (but not for any Other Business), 50% of which shall be based on the total original Capital Commitments to each existing Fund and 50% of which shall be based on the then remaining Capital commitments to each existing Fund.

*Id.* (the "First Allocation Provision").

The Company likes the First Allocation Provision because it states that "such Promote Income shall be distributed only to the Managing Members in proportion to their weighted average Promote Interests for each existing Fund (but not for any Other Business)." The Company reads this provision to establish as a matter of law that Paul was only entitled to an allocation based on his "weighted average Promote Interests for each existing Fund (but not for any Other Business)." The Company concludes that it is not possible to allocate any value to Paul for anything other than his interests in existing funds.

As noted, the Third LLC Agreement completely superseded the Second LLC Agreement, which completely superseded the First LLC Agreement. The Third Allocation Provision incorporates the Ninth Amendment by reference, but the Ninth Amendment does not restore the First Allocation Provision. Article 6 of the Ninth Amendment never refers back to the First Allocation Provision. The Ninth Amendment as a whole never refers back to the First Allocation Provision. And that makes sense, because after the Ninth Amendment and his separation from the Company, Paul was no longer a Managing Member. He had a hybrid status under the Ninth Amendment, which treated him in different ways for different interests.

Once the parties executed the Ninth Amendment, only the Ninth Amendment mattered for purposes of allocating Company Sale proceeds. The Managing Members extinguished the Ninth Amendment when they entered into the Second LLC Agreement and brought the content the Ninth Amendment into that agreement. The

Managing Members then revived the Ninth Amendment—and only the Ninth Amendment—when they entered into the Third LLC Agreement and incorporated the Ninth Amendment by reference.

The Settlement Appraiser must start with the Third Allocation Provision. Then the Settlement Appraiser must walk through Article 6 of the Ninth Amendment and follow the valuation procedures in that article. The First LLC Agreement and the First Allocation Provision have nothing to do with it.

## G. The Settlement Appraiser Cannot Consider Extrinsic Evidence.

The parties final dispute on the merits concerns whether the Settlement Appraiser can consider extrinsic evidence such as the Fox Declaration. No one has pointed to any ambiguities in the Ninth Amendment, and if any existed, the court likely would have to resolve them. The Fox Declaration is extrinsic evidence that only would be relevant in the event of an ambiguity. The Settlement Appraiser cannot consider it.

The Settlement Appraiser also cannot consider the Legal Opinion. It analyzes the First LLC Agreement, which is irrelevant to the Settlement Appraiser's task. The Company also did not supply Professor Hamermesh with either the Second LLC Agreement or the Third LLC Agreement, which renders the Legal Opinion unreliable.

Finally, the Settlement Appraiser cannot consider the FAQs. That document is not a typical appraisal exhibit. It is skilled advocacy consisting of factual assertions and legal argument.

## H.    The Remedy

The Company submitted an improper appraisal. The court could strike the Company's appraisal in its entirety, leaving Paul's appraisal as the sole valuation for the Settlement Appraiser to consider. Paul, however, has not requested that relief. He asks only that the Company's appraisal be redacted to omit the offending material. That form of relief is both more conversative and fitting here.

The Company's appraisal cannot refer to or attach the Legal Opinion, the Fox Declaration, or the FAQs. At a minimum, the Company must redact the portion of the report that begins on page 26 with the sentence "Colchester is not a legal expert, however." The redaction must continue through page 28, where it can stop just before the heading for Section 3.3. The Company also must redact the second sentence of Section 3.7.

The Company's appraisal cannot make arguments based on the First LLC Agreement or the First Allocation Provision. The Ninth Amendment superseded the First Allocation Provision for purposes of allocating proceeds from a Company Sale. The Second LLC Agreement then wiped out both the First LLC Agreement and the Ninth Amendment. Finally, the Third LLC Agreement wiped out the Second LLC Agreement, but restored the Ninth Amendment by incorporating it by reference. The Settlement Appraiser's task is to apply Article 6 of the Ninth Amendment.

Paul will take a first crack at redacting the Company's appraisal. If the Company disputes Paul's redactions, then the parties' Delaware counsel will confer in person. If no agreement is reached, then Paul may file a motion to determine what redactions are warranted.

41

## III.    CONCLUSION

The Company's motion to dismiss Count III is DENIED. Paul's Motion for Summary Judgment on Count III is GRANTED. The parties must submit an implementing order within fourteen days.